T.C. Memo. 2010-168

UNITED STATES TAX COURT

ESTATE OF RALPH ROBINSON, DECEASED,
JAMES ROBINSON, EXECUTOR, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 20941-07.                    Filed August 2, 2010.

<u>Tommy K. Cryer</u>, for petitioner.

<u>Nick G. Nilan</u> and <u>Catherine Campbell</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined a $380,514 deficiency
in the Federal estate tax of the Estate of Ralph Robinson (the
estate) and a $76,103 accuracy-related penalty under section

6662(a).[1]  The estate has conceded the entire deficiency.  The sole issue for decision is whether the estate is liable for the accuracy-related penalty on account of negligence or disregard of rules or regulations.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.  Ralph Robinson (decedent) was a resident of Washington State when he died at the age of 91 on October 5, 2003.  James Robinson (James), decedent's son and executor of the estate, also resided in Washington State when the petition was filed.

Decedent, a widower, suffered from Alzheimer's disease.  In 1999 decedent executed a durable power of attorney naming his daughter Carol Robinson (Carol) attorney-in-fact and giving Carol control of his assets.  Decedent's will also named Carol personal representative of the estate.[2]  At Carol's request, James became co-personal representative.  James assumed responsibility for decedent's estate planning.

---

[1]  Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]  In the case that Carol could not act as personal representative, the will named James alternate personal representative.

James is a computer programmer. He does not have a college degree. He completed only one basic accounting course and has never taken any tax courses.

James prepared his own income tax returns until the early 1980s, when he acquired two rental properties. It became increasingly difficult for James to prepare his own tax returns, so he hired a former Internal Revenue Service (IRS) employee, James Haley (Mr. Haley), to prepare them on his behalf. Mr. Haley prepared James' returns until Mr. Haley passed away in 1995 or 1996.

James looked for another income tax return preparer. By that time, James had sold, or would soon sell, the rental properties and had become involved in a sales job selling soap. He thought the new activities involved "a lot of paperwork" and consequently did not want to prepare his own tax returns. A friend, Tom Monforton (Mr. Monforton), whom James considered a successful businessman, recommended John Schlabach (Mr. Schlabach) to prepare James' returns. Mr. Schlabach had prepared Mr. Monforton's tax returns, and Mr. Monforton believed Mr. Schlabach was very competent.

In 1996 or 1997 James visited Mr. Schlabach's office, where he noticed Mr. Schlabach's "Enrolled Agent"[3] plaque on the wall.

_____

[3] The IRS grants enrolled agent status to "an applicant who demonstrates special competence in tax matters by written

(continued...)

Following this visit, James hired Mr. Schlabach to prepare his income tax returns. Before hiring him, however, James informed Mr. Schlabach that he did not want to take any risky tax positions. From about 1997 through 2007, Mr. Schlabach prepared James' income tax returns.

A few years after their initial meeting, James noticed that Mr. Schlabach's business cards included the phrase "Estate Planning". When James asked Mr. Schlabach if he was expanding into estate planning, he informed James that he was certified in this area and had always provided such services.

James eventually hired Mr. Schlabach to provide estate planning services for decedent. Decedent, who had worked as a lumber mill saw filer, amassed a sizable estate during his lifetime. Decedent had previously expressed his desire to minimize his estate tax liability and to avoid probate after the considerable amount of time it took to probate his brother's estate. Mr. Schlabach's estate plan for decedent included (1) a living trust, (2) a transfer of real estate into a trust, and (3) a charitable foundation.

---

[3](...continued)
examination administered by, or administered under the oversight of, the Director of the Office of Professional Responsibility and who has not engaged in any conduct that would justify the censure, suspension, or disbarment of any practitioner". 31 C.F.R. sec. 10.4(a) (2009). The IRS disbarred Mr. Schlabach from practicing before the IRS in 2001. 2002-2 C.B. 419, 420.

On Mr. Schlabach's advice, James and Carol established the Ralph Kitson Robinson Living Trust (living trust) in September 2002.[4] James and Carol were appointed cotrustees of the living trust. Carol transferred decedent's brokerage account to the living trust. Decedent's primary residence was also transferred to the living trust. James understood the values of the assets in the living trust would be included in the value of the gross estate and subject to estate tax but agreed to establish a living trust to avoid probate.

Subsequently, Mr. Schlabach advised James that decedent could exclude the value of six vacant residential lots (Everett real estate) from the value of decedent's gross estate by transferring the properties to a trust. In July 2003 Carol executed a quitclaim deed and conveyed the Everett real estate to the Alden Granville Trust, Laurel Durkee, Trustee. James was under the impression that transferring the Everett real estate to a "pure trust" was a legal means of avoiding the estate tax.

After decedent's death, Mr. Schlabach informed James that the value of decedent's estate appeared to exceed the applicable

---

[4] The living trust's purposes were to (1) receive and manage assets for decedent's benefit during decedent's lifetime, and (2) manage and distribute such assets upon decedent's death. Upon decedent's death, the trust was to pay for caregivers and expenses that came due after death (e.g., funeral expenses). After payment of expenses, the assets were to be distributed in equal shares to James and Carol.

exclusion amount.[5]  On the basis of this assessment, Mr.
Schlabach advised James to establish and transfer assets to a
charitable trust to reduce the value of the estate below the
exclusion amount.  Mr. Schlabach explained that this strategy
would eliminate any estate tax liability while creating an entity
that could be used to make charitable gifts.

In November 2003 James and Carol established the Robinson
Foundation, purportedly as a section 4947(a)(1) nonexempt
charitable trust.  The Robinson Foundation appointed James and
Carol cotrustees.[6]  James then transferred assets from the living
trust to the Robinson Foundation.[7]

To support his recommendations in planning the estate,
especially those pertaining to the Robinson Foundation, Mr.
Schlabach showed James legal forms and printed out cases and
portions of the Code for James to read.  James read the statutes
and cases but did not completely understand them.  When Mr.

---

[5]  The applicable exclusion amount, or unified credit, is in
effect the maximum value of the taxable estate that can be
exempted from the imposition of the Federal estate tax.  Sec.
2010(a).  The applicable exclusion amount for 2003 was $1
million.  Sec. 2010(c).

[6]  Under provisions of the trust, James and Carol had
authority to distribute income and/or principal to charitable
organizations.  In 2004 they each received $2,500 a month as
trustees.

[7]  Mr. Schlabach prepared Form 990-PF, Return of Private
Foundation, for years 2005, 2006, and 2007, but the Robinson
Foundation never requested tax-exempt status.  James signed each
Form 990-PF.

Schlabach explained the statutes and each case pertinent to Mr. Schlabach's position, James found that Mr. Schlabach's explanations were logical and supported the estate plan.

James also hired Mr. Schlabach to prepare the estate's Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, because Mr. Schlabach had been involved in structuring decedent's estate. Mr. Schlabach requested information and documentation from James. James disclosed everything he knew that could be pertinent to the estate and everything that Mr. Schlabach requested. James, however, was not aware of, and consequently did not provide Mr. Schlabach, information on brokerage and bank accounts owned by decedent with assets totaling $64,077. James reviewed and signed the Form 706.

In preparing the Form 706, Mr. Schlabach did not include the accounts totaling $64,077 and the assets in the Alden Granville Trust (i.e., the Everett real estate) in the value of decedent's gross estate.[8] The estate claimed a $941,000

---

[8] Decedent was the beneficiary of the Alden Granville Trust until the time of his death. Sec. 2036(a) requires inclusion in the gross estate of the value of any property transferred by a decedent (except in the case of a bona fide sale for full and adequate consideration) if the decedent has retained for his life the enjoyment of, or the right to income from, the property. Additionally, the value of the gross estate includes the value of any interest transferred by the decedent, the enjoyment of which was subject at the date of the decedent's death to change by virtue of the decedent's retention of the power to alter, amend, revoke, or terminate the transfer, or where such power was relinquished during the 3-year period ending with the decedent's

(continued...)

charitable contribution deduction for transfers made to the Robinson Foundation.[9]

In the notice of deficiency, the IRS determined the value of the Everett real estate on the date of death was $242,900 and included that amount in the value of decedent's gross estate. The IRS also disallowed the $941,000 charitable contribution deduction.

James conceded all issues stated in the notice of deficiency except for the accuracy-related penalty. After the IRS issued the notice of deficiency, the parties agreed that the additional assets totaling $64,077 omitted from the Form 706 should have been included in the value of decedent's gross estate.[10]

## OPINION

Section 7491(c) provides that the Commissioner bears the burden of production with respect to the liability of any individual for additions to tax and penalties. "The

---

[8](...continued)
death. Sec. 2038(a)(1).

[9] Following Mr. Schlabach's advice, James erroneously believed he had the power to make charitable contributions on behalf of the estate. Neither the will nor the living trust, however, directed any transfers for the benefit of the Robinson Foundation or any charitable organization. The parties agree that as the will did not have a provision allowing James to make charitable contributions, the values of assets transferred from the living trust into the Robinson Foundation should not have been deducted from the value of the gross estate.

[10] The IRS did not determine a deficiency relating to the $64,077 in additional assets in the notice of deficiency.

Commissioner's burden of production under section 7491(c) is to produce evidence that it is appropriate to impose the relevant penalty, addition to tax, or additional amount". Swain v. Commissioner, 118 T.C. 358, 363 (2002); see Higbee v. Commissioner, 116 T.C. 438, 446 (2001). The Commissioner, however, does not have the obligation to introduce evidence regarding reasonable cause or substantial authority. Higbee v. Commissioner, supra at 446-447. Once the Commissioner has met his burden of production, the taxpayer must come forward with evidence sufficient to persuade a court that the Commissioner's determination is incorrect. Id.

Pursuant to section 6662(a) and (b)(1), a taxpayer may be liable for a penalty of 20 percent on the portion of an underpayment of tax due to negligence or disregard of rules or regulations. The term "negligence" in section 6662(b)(1) includes any failure to make a reasonable attempt to comply with the Code and any failure to keep adequate books and records or to substantiate items properly. Sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs. Negligence is "strongly indicated" where the taxpayer "fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances". Sec. 1.6662-3(b)(1)(ii), Income Tax Regs. "Disregard" means any careless, reckless, or

intentional disregard.  Sec. 6662(c); sec. 1.6662-3(b)(2), Income Tax Regs.  We find that respondent has met his burden of production.

The accuracy-related penalty does not apply with respect to any portion of an underpayment if it is shown that there was reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion.  Sec. 6664(c)(1).  The determination of whether a taxpayer acted with reasonable cause and in good faith depends on the pertinent facts and circumstances.  Sec. 1.6664-4(b)(1), Income Tax Regs.  The most important factor is the extent of the taxpayer's effort to assess his or her proper tax liability.  Id.  "Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer."  Id.

Good faith reliance on the advice of an independent, competent professional as to the tax treatment of an item may constitute reasonable cause.  Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 98-99 (2000), affd. 299 F.3d 221 (3d Cir. 2002); sec. 1.6664-4(b), Income Tax Regs.; see also United States v. Boyle, 469 U.S. 241, 250 (1985).  "Much like a taxpayer's reliance on an attorney or an accountant, reliance on an enrolled agent is a factor we may consider in determining the

reasonableness of a taxpayer's actions". Mortensen v. Commissioner, 440 F.3d 375, 388 (6th Cir. 2006), affg. T.C. Memo. 2004-279.[11]

A taxpayer's reliance must be in good faith and demonstrably reasonable. Ewing v. Commissioner, 91 T.C. 396, 423 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991); Freytag v. Commissioner, 89 T.C. 849, 888-889 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). In such a case, a taxpayer will be entitled to rely upon a competent expert's advice, even if the advice should prove to be erroneous. Jackson v. Commissioner, 86 T.C. 492, 539 (1986), affd. on other issues 864 F.2d 1521 (10th Cir. 1989); Brown v. Commissioner, 47 T.C. 399, 410 (1967), affd. per curiam 398 F.2d 832 (6th Cir. 1968).

This Court has stated that reasonable cause and good faith are present where the record establishes by a preponderance of evidence that: (1) The taxpayer reasonably believes that the professional upon whom the reliance is placed is a competent tax adviser who has sufficient expertise to justify reliance; (2) the

---

[11] In Mortensen v. Commissioner, T.C. Memo. 2004-279, affd. 440 F.3d 375 (6th Cir. 2006), we found the taxpayer's reliance on the enrolled agent to have little or no value because, inter alia, the enrolled agent was also the creator and promoter of the investment. The enrolled agent in Mortensen received the bulk of the tax benefits from promoting the investment and preparing the taxpayer's returns and therefore had a serious conflict of interest and was not an independent adviser. We find the facts in this case to be distinguishable from the facts in Mortensen.

taxpayer provides necessary and accurate information to the adviser; and (3) the taxpayer actually relies in good faith on the adviser's judgment.  Estate of Lee v. Commissioner, T.C. Memo. 2009-84 (citing Neonatology Associates, P.A. v. Commissioner, supra at 99).

James is unsophisticated in tax matters.  Even with respect to his personal income taxes, he has almost always relied on the guidance of others.  He has not had any formal training in accounting or taxation.  Before hiring Mr. Schlabach, James told Mr. Schlabach that he was not inherently a risk-taker.  James indicated to Mr. Schlabach that he wanted everything to be "covered and legal" and "not be called into question."

James believed Mr. Schlabach was competent in estate planning because he was an enrolled agent who knew "how to file each and every return that the IRS has" and had to pass a minimum competency test to be approved to practice before the IRS.  He credibly testified that he did not know Mr. Schlabach had been disbarred.

James also believed Mr. Schlabach had estate planning expertise because Mr. Schlabach's business card included the phrase "Estate Planning" and he could cite the Code. Additionally, Mr. Schlabach told James that he was certified and had always provided estate planning services.

On the basis of the foregoing and the fact that Mr. Schlabach prepared James' income tax returns for about 11 years

without incident, James was reasonable in believing that Mr. Schlabach was a competent estate tax adviser as well.

We find James provided Mr. Schlabach all relevant financial data in his possession needed to determine the correct amount of estate tax.

We find James relied on Mr. Schlabach in good faith. Before James hired Mr. Schlabach to prepare the Form 706, Mr. Schlabach had been involved in planning the estate, and James believed he had done more than an acceptable job. When James hired Mr. Schlabach to prepare the Form 706, he believed it was more logical and responsible than hiring another tax return preparer who had no knowledge of the estate.

James relied on Mr. Schlabach for many years without incident and continued to trust Mr. Schlabach's explanations and advice. We conclude James reasonably and in good faith relied on Mr. Schlabach. We hold that the estate is not liable for the accuracy-related penalty.

In reaching all of our holdings herein, we have considered all arguments made by the parties, and to the extent not mentioned above, we find them to be irrelevant or without merit.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.